FILED

2016 Sep-16  PM 03:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

GARY P. HOLLIS,  )
 )
Plaintiff,  )
 )
vs.  )     7:15-cv-00854-LSC
 )
SOUTHERN COMPANY  )
SERVICES, INC.,  )
 )
Defendant.  )
 )

**MEMORANDUM OF OPINION**

## I.   INTRODUCTION

Plaintiff Gary P. Hollis ("Hollis") filed this action against his former employer, Southern Company Services, Inc. ("SCS"), alleging that SCS unlawfully discriminated against him due to his age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the Alabama Age Discrimination in Employment Act ("AADEA"), Ala. Code § 25-1-20 *et seq.* Before this Court is Defendant SCS's motion for summary judgment (Doc. 16), which has been fully briefed and is ripe for decision. For the reasons explained below, Defendant SCS's motion is due to be denied.

## II.   Factual Background[1]

### A. Employment History

In total, Hollis's career with the family of companies under the SCS umbrella spans more than two decades. He first began working in supply chain management for SCS in September 1990. (Hollis Decl. ¶¶ 3, 5.) Specifically, Hollis was employed by Southern Nuclear in major equipment and labor contracts for on-site labor at one of Georgia Power Company's facilities, Plant Hatch. (*Id.* ¶ 5.) In 1998, Hollis moved to Alabama Power, where he handled corporate contracts and served as a plant buyer for two plants. (*Id.*) Beginning in 2002, Hollis set up on-site inventory for the company's coastal plants. (Doc. 18-2 at 3.) He then moved in June 2003 to the engineering and construction services area, issuing contracts and purchase orders for new projects. (Hollis Decl. ¶ 5.)

In 2005, Hollis was assigned to strategic sourcing and was particularly active in the area of volume procurement. (*Id.* ¶ 6.) He served under several managers while employed in strategic sourcing, including Mary Belman ("Belman") in 2009 and Tim McAlister ("McAlister") for part of 2011. (*Id.* ¶¶ 7, 9.) After several

---

[1] In ruling on a motion for summary judgment, this Court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the . . . motion." *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007)). Thus, if the parties' versions of the facts differ with regard to a particular issue, this Court accepts the nonmoving party's version as true. *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013).

years in strategic sourcing, Hollis expressed a desire to move into a leadership role with SCS. (Doc. 24-5 at 50.) He applied for at least one such position but was denied an interview because he lacked adequate "supervisory experience." (Hollis Dep. at 18:16–19:21.) When Hollis asked Director of Supply Chain Management Laura Green ("Green"), a member of the interview committee, how he could be awarded an interview in the future, Green told him that it would be "very difficult" to interview for a supervisory position "at [that] stage of [his] career." (*Id.* at 19:14–19:21.) Because Hollis was actively seeking other opportunities within the company, Belman and McAlister informed Hollis of an open position as a sourcing agent for Southern Power. (*Id.* at 14:6–15:14.) The recommendation from his supervisors that he was a "great fit" for the position encouraged Hollis to make a developmental move in August 2011. (*Id.* at 12:7–12:10; 14:6–15:10.)

As a sourcing agent, Hollis was expected to assemble bid packages for various plants, which required him to draft and format contracts, among other tasks. (*Id.* at 248:3–248:23.) He had been performing similar work before the move, and prepared major equipment purchasing contracts with the assistance of a team of engineers. (*Id.* at 12:4–13:20.) By contrast, once Hollis transferred to Southern Power, he prepared labor contracts, which required "more documentation" than the major equipment contracts. (*Id.* at 13:20–14:6.) The differences in the contracts

for the two positions turned out to be "greater than [Hollis] had realized" before he accepted the change. (*Id.* at 14:2–14:6.) Nonetheless, Hollis remained in the position until his termination in January 2014. (*Id.* at 11:20–12:3.)

## B. PERFORMANCE REVIEWS

In general, Hollis received positive performance reviews throughout his employment with SCS. In 2008, Rick Crosby ("Crosby"), Hollis's Team Leader, rated him as "Expectations Fully Met" for the year, noting that Hollis "processed 67 major equipment purchase orders in 2008 in excess of 84 million dollars." (Doc. 24-5 at 51, 53.) Crosby also described Hollis as "a credible and commendable representative of the Southern Company." (*Id.* at 54.) Hollis's key strengths, according to Crosby, were his contracts knowledge and his verbal and written communications, but his key gaps included his computer skills and "status reporting." (*Id.* at 55.)

Hollis again "fully met" expectations in 2009 while working under Belman in strategic sourcing. Belman specifically described Hollis's "effective" communication skills on both the mid-year and year-end performance reviews. (*Id.* at 46, 47.) She also remarked about Hollis's ability to "make[] sure all of his inquiries are in compliance with both the plant/engineering needs as well as the

Supply Chain policies and procedures." (*Id.* at 48.) Like Crosby, Belman identified Hollis's contracts knowledge as one of his key strengths and his computer skills as one of his key gaps. (*Id.* at 50.)

In 2010, Hollis's last full year in strategic sourcing before he accepted the developmental move to Southern Power, his Team Leader Les Deese ("Deese") once again rated him as "Expectations Fully Met." (*Id.* at 30.) Deese described Hollis as a "key contributor" to the company in the major equipment and volume procurement areas. (*Id.* at 41.) As in previous years, Hollis's key strengths were his "communication skills" and "contracts backgrou[n]d." (*Id.* at 40.) However, Deese also stated that Hollis needed to "quickly improve[] his understanding and use" of the company's software and "to be more organized and send documents to the file in a timely manner" because his files "appeared unorganized and [it was] hard to locate key documents." (*Id.*) Deese gave Hollis a deadline of September 15 to "develop[] a working knowledge" of the software (*id.*) and noted on his year-end summary that Hollis "sought [additional] training from one on one observation with his peers on several occasions" and "will need to continue to attend training" to improve his proficiency (*id.* at 37).

Hollis began 2011 with a goal to "[b]ecome an efficient user of [the company's software] by year end." (*Id.* at 23.) On his mid-year evaluation, Hollis's

Team Leader noted that Hollis was "currently meeting expectations" with regard to the goal. (*Id.* at 24.) The Team Leader also commended Hollis for his "[s]trong [c]ommunication skills" and his ability to "build[] [c]onsensus" but again pointed out Hollis's knowledge of company software and his organization of his files as key gaps. (*Id.* at 29.) Following Hollis's developmental move in August 2011, he was required to familiarize himself with Southern Power's software and processes. (*Id.*) On her year-end review of Hollis's performance, Belman noted that Hollis "continue[d] to build confidence" in that area (*id.*) and "provide[d] strong documentation for his inquiries and contracts" (*id.* at 24). Belman rated Hollis as "Expectations Fully Met" for 2011. (*Id.* at 22.)

Hollis was also rated as "Expectations Fully Met" in 2012, although Belman "retired prior to providing [Hollis's] year end review." (*Id.* at 13.) Hollis's key strengths and gaps were identical to those listed in 2011. (*Id.* at 20.) On Hollis's mid-year review, Belman noted that Hollis "continue[d] to work on his organizational skills and need[ed] to continue his focus on timeliness of completing documentation." (*Id.* at 21.) Hollis's 2012 mid-year review was the last one completed prior to McAlister taking over as Hollis's Team Leader. However, "[s]ome issues were discussed regarding responding to suppliers, cop[y]ing manager on all correspond[e]nces and documentation being filed on the S Drive."

(*Id.* at 13.) Belman expressed during the latter part of 2012 that Hollis was not adjusting to his position as she had expected "in light of his past experience." (Belman Decl. ¶ 8.)

## C. Discipline and Termination

When Belman was promoted in early 2013, Hollis applied for the Team Leader position she vacated. (Hollis Decl. ¶¶ 26, 27.) McAlister, however, was selected to fill the position and became Hollis's new supervisor in May 2013. (*Id.* ¶ 30.) Shortly afterward, in June 2013, McAlister notified Hollis by letter that Hollis was "in jeopardy of 'Not Meeting Expectations' for the first half of 2013." (McAlister Dep. Ex. 1.) The letter requested Hollis's participation in "an official performance counseling process" to address "the gaps in [Hollis's] performance." (*Id.*) McAlister specifically identified Hollis's "improper use of punctuations in communications to customers and contractors" and failure to "updat[e] the contract[] roster on a weekly basis" as some of the reasons performance counseling was necessary. (*Id.*)

As part of the "performance counseling process," Hollis agreed to complete an "Action Plan" that required him to review certain SCS policies and manuals, create several "mock" contractual documents, and regularly update the contract

roster. (*Id.*) He was also instructed to include McAlister on all business correspondence and invite him to all pre-bid meetings. (*Id.*) Hollis expressed to McAlister that he "had real concerns" about completing the work within the time set by the Action Plan, but no changes were made to the timeline. (Hollis Dep. at 166:23–167:2.) Despite "work[ing] overtime and on some weekends to meet the recommended guidelines" (Doc. 24-5 at 4), Hollis completed some, but not all, of the items on the Action Plan by the deadlines specified (McAlister Dep. Ex. 1).

McAlister rated Hollis as "Needs Improvement" on his 2013 mid-year performance review, stating that Hollis "ha[d] improved his performance" since the performance counseling process had been put in place but "was not w[h]ere [McAlister] would like him to have been." (Doc. 24-5 at 1.) McAlister thus extended the Action Plan to the end of the year. (*Id.*) McAlister was specifically dissatisfied with Hollis's contracts, stating that the contracts "met internal control requirements, but [not] the quality standard [because Hollis] was using the incorrect template and attachments together and his communications were very informal." (*Id.* at 5.) McAlister requested that Hollis "begin to use technology to improve how he develop[ed] and assemble[d] contracts." (*Id.*)

Around two months later, on September 10, 2013, Hollis received a "Level II Discipline Reminder" that cited "Work Performance" as the "Problem

Category." (Doc. 24-6 at 1.) Hollis had submitted an "Inquiry Package" for McAlister's review on September 9, which McAlister found to be "unacceptable" and asked Hollis to resubmit. (McAlister Decl. ¶ 95.) Hollis's second draft, according to McAlister, did not address the formatting issues and "necessary language to link the documents together to form a contract," prompting McAlister to issue the disciplinary reminder. (Doc. 24-6 at 1.) Hollis agreed to resolve the problem before the end of the month and was instructed to "print the inquiry packages and contracts and review [them] for formatting and linkage," update the contract roster weekly, and "[i]mprove his knowledge and usage of Microsoft Word." (*Id.* at 2.)

McAlister continued to review Hollis's work over the following weeks. (McAlister Decl. ¶¶ 19–23.) On October 2, Hollis had a follow-up meeting with McAlister and Green to discuss Hollis's progress and "areas [McAlister and Green] wanted [Hollis] to work on." (Hollis Dep. at 166:14–168:14.) In late October and November 2013, McAlister noted improvement in Hollis's contract formulation, including a contract from late November that "did not require any edits." (McAlister Decl. ¶¶ 23–24.) McAlister told Hollis that he had noticed and appreciated Hollis's effort. (McAlister Dep. at 42:5–42:8.) Given that feedback, Hollis believed he had corrected the issues McAlister found with his work product.

(Hollis Decl. ¶ 83.) In mid-December, however, McAlister expressed to Hollis that despite Hollis's improvement, McAlister was "not ready to turn [Hollis] totally loose" and allow him to send out contracts without initial review from McAlister. (Hollis Dep. at 184:3–184:9.) When Hollis asked what more he could do, McAlister replied, "What is another month going to get us?" (*Id.* at 184:3–184:22; McAlister Dep. at 42:12–42:19.)

Two weeks later, McAlister rated Hollis as "Expectations Not Met" on his 2013 year-end performance review. (Doc. 24-5 at 1.) McAlister stated that "[i]n order to meet expectations by the end of the year, [Hollis] would have to be able to issue inquiry packages and contracts to suppliers without [McAlister] reviewing them first and have proper linkage between all contract documents including purchase orders by the end of September." (*Id.*) Although McAlister noted that Hollis "tried hard to meet this expectation," McAlister did not feel confident even after six months of "performance counseling" that Hollis's work product was sufficient without McAlister's review. (*Id.*) McAlister never discussed the performance review with Hollis prior to Hollis's termination. (McAlister Dep. at 53:10–53:23.)

On January 8, 2014, Hollis violated SCS's separation protocol by inadvertently sending a document with pricing information belonging to Georgia

Power to employees of Southern Power. (Hollis Decl. ¶ 56.) Although the violation was not reportable to federal regulators because the emails were called back from the recipients without disclosure of the confidential information (*id.* ¶¶ 59–60), Green considered it "a very big deal internally" (Green Dep. at 28:21–29:5). SCS had no formal policy regarding discipline for separation protocol violations. (Davis Dep. at 25:22–26:2.) However, following this violation, Green and McAlister recommended Hollis for termination. (Green Dep. at 25:9–26:4.)

The morning of January 13, 2014, McAlister stopped by Hollis's office and asked Hollis to "join [him] in the conference room." (Hollis Dep. at 204:17–205:4.) At the meeting, McAlister read Hollis a statement informing Hollis that he was being terminated. (*Id.* at 205:13–205:22.) SCS human resources representative Teresa Jones ("Jones") then presented Hollis with a "separation checklist." (*Id.* at 206:10–206:16.) Hollis did not have an opportunity to ask questions, but Jones did give him the option to resign rather than be fired, which Hollis declined. (*Id.* at 206:18–208:4.)

At the time of his termination, Hollis "was a senior-level contracts employee" with more than two decades of experience preparing contracts for SCS. (Green Dep. at 21:12–21:14.) He was sixty-three years old. (Hollis Decl. ¶ 64.) SCS did not immediately fill the position left vacant by Hollis's termination but instead

assigned his duties to the two other sourcing agents in his department. (McAlister Dep. at 34:19–35:2.) Three to four months later, SCS moved former plant buyer Clayton Cox ("Cox"), who was in his late twenties, into Hollis's former position. (McAlister Dep. at 35:2–36:15.) Following Cox's transfer to a different position, SCS once again assigned some of Hollis's duties to the two other sourcing agents and hired Lauren Lee, who was in her mid-thirties, as a part-time employee to take over Cox's work. (McAlister Dep. at 38:5–38:17.)

## III. Standard of Review

A motion for summary judgment is due to be granted upon a showing that "no genuine dispute as to any material fact" remains to be decided in the action and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to a material fact exists "if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

## IV.  DISCUSSION

The ADEA[2] prohibits an employer from discharging an individual or "otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment" based on the individual's age. 29 U.S.C. § 623(a)(1). Absent direct evidence of age discrimination, such as specific statements made by the employer's representatives, an ADEA plaintiff may demonstrate circumstantial evidence of disparate treatment through the *McDonnell Douglas* burden-shifting framework. *See Liebman v. Metropolitan Life Ins. Co.*, 808 F.3d 1294, 1298 (11th Cir. 2015); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, the aggrieved employee "creates a presumption of unlawful discrimination" by first establishing a prima facie case of age discrimination. *Liebman*, 808 F.3d at 1298. The burden then shifts to the employer "to rebut the presumption of discrimination with evidence of a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* (quoting *Kragor v. Takeda Pharm. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012)). If the employer proffers a legitimate, nondiscriminatory reason, the burden returns to the employee to prove that the

---

[2] A claim under the AADEA is analyzed under the same evidentiary framework as one made under the ADEA. *Robinson v. Ala. Cent. Credit Union*, 964 So. 2d 1225, 1228 (Ala. 2007). Therefore, this Court will not discuss each claim separately.

employer's reason is a pretext for unlawful discrimination. *Id.* Stated another way, the employer's legitimate, nondiscriminatory reason for the adverse employment action destroys the presumption of discrimination but leaves the plaintiff an opportunity to prove his case through additional evidence of discrimination. *Kragor*, 702 F.3d at 1308 n.1.

## A. Prima Facie Case

To establish a prima facie case of age discrimination, the plaintiff employee must demonstrate that (1) he was a member of the protected group between the age of forty and seventy; (2) he was subject to an adverse employment action; (3) a substantially younger person filled the position from which the plaintiff was discharged; and (4) he was qualified to do the job from which he was discharged. *Liebman*, 808 F.3d at 1298. The initial burden to demonstrate a prima facie case of discrimination is a low threshold for the plaintiff to meet. *See English v. Bd. of Sch. Comm'rs of Mobile Cnty.*, 83 F. Supp. 3d 1271, 1282 (S.D. Ala. 2015).

No dispute exists in this case that Hollis, who was sixty-three years old at the time of his termination (Hollis Decl. ¶ 64), is entitled to the protections of the ADEA. *See* 29 U.S.C. § 631(a) (limiting the application of the ADEA to individuals forty years of age or older). Further, both parties agree that Hollis was discharged

from his position in January 2014, after more than two decades of employment with Defendant. (Hollis Decl. ¶ 64.) This long-term employment coupled with the fact that Hollis spent two years as a sourcing agent (Hollis Dep. at 11:20–12:10) and the previous seven years in strategic sourcing (Hollis Decl. ¶ 10) performing similar work demonstrates that Hollis was qualified for the job from which he was discharged. *See Liebman*, 808 F.3d at 1299 (explaining that the employee's tenure in the position may establish that he was qualified for the job, irrespective of whether the plaintiff was "performing as expected" at the time of his termination). Finally, the employee who eventually replaced Hollis following Hollis's discharge was in his late twenties at the time he took over the position. (McAlister Dep. at 34:19–36:7.) Hollis has thus presented sufficient evidence on each of the elements to establish a prima facie case of age discrimination.

## B. Legitimate, Nondiscriminatory Reason

The employer's burden to articulate a legitimate, nondiscriminatory reason for taking the adverse employment action against the plaintiff employee is sufficiently satisfied if the employer presents evidence that "raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997)). The presumption of discrimination

is eliminated if the employer produces evidence that "would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Combs*, 106 F.3d at 1528 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 257 (1981)) (emphasis deleted). "An employer's good faith belief that an employee's performance is unsatisfactory constitutes a legitimate nondiscriminatory reason for termination." *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir. 1993) (citing *Young v. Gen. Foods Corp.*, 840 F.2d 825, 830 (11th Cir. 1988)).

In response to Hollis's claim of age discrimination, SCS counters that Hollis was terminated due to his continuing "performance issues" and lack of improvement in areas identified by his supervisors, Belman and McAlister. Specifically, SCS alleges that Hollis failed to communicate in a timely manner with plants and contractors; was unprepared for pre-bid meetings; failed to update the contract roster on a regular basis; prepared contract documents using multiple formats, fonts, and colors; sent business communications that contained exclamation points or were otherwise unprofessional; and failed to correct previously identified errors even after multiple drafts of documents. (Doc. 17 at 29.)

SCS's assertions also have support in the record. For example, McAlister attributed Hollis's termination to a general "lack of attention to detail" in the preparation of contract documents and a violation of SCS's separation protocol. (McAlister Dep. at 32:10–32:13.) Hollis's primary weaknesses, according to McAlister, in his "contract writing" included improper linkage, formatting and grammatical errors, and content issues, such as referencing the wrong plant in a contract. (McAlister Dep. at 24:14–24:20.) Green similarly cited Hollis's need for attention to detail as the reason for Hollis's termination. (Green Dep. at 25:19–25:20.) She explained that she and McAlister made the decision to terminate Hollis upon his "release[ of] sensitive information" (i.e., violation of the separation protocol) following several months of McAlister's "having to review every e-mail and every contract that [Hollis] was issuing." (*Id.* at 25:6–26:4.) This evidence, were the trier of fact to believe it as true, allows for the rational conclusion that SCS terminated Hollis based on his performance, rather than due to his age.

Because SCS has presented a legitimate, nondiscriminatory reason for Hollis's termination (i.e., poor performance), the presumption of unlawful discrimination is eliminated.

## C. Pretext for Age Discrimination

The plaintiff may attack the employer's explanation for the adverse employment action "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Kragor*, 702 F.3d at 1308 (quoting *Burdine*, 450 U.S. at 256). To do this, the plaintiff must "produce sufficient evidence to allow a reasonable finder of fact to conclude that the [employer's] articulated reasons [for the adverse employment action are] not believable." *Brooks v. Cnty. Comm'n of Jefferson Cnty.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (citing *Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005)). An employer's proffered reason might be unworthy of credence, for example, where the employee points out "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the explanation that have a basis in the record. *Id.* (quoting *Jackson*, 405 F.3d at 1289).

The essence of Hollis's argument seems to be not so much that he was fired and replaced with a younger employee but that McAlister, as Hollis's supervisor, refused to train him properly because McAlister preferred to work with younger individuals. (Hollis Dep. at 232:9–235:1.) This denial of adequate training, according to Hollis, "purposefully and methodically set him up to fail" in his job,

eventually resulting in his termination. (Doc. 23 at 27, 29.) Hollis did receive training from Belman for his new position following his developmental move in 2011. (Doc. 18-2 at 3.) He had also been performing similar work—although for equipment rather than labor contracts—prior to the transfer and was a "senior-level contracts employee," which led Green to believe that Hollis would be successful in the new position. (Green Dep. at 21:10–21:16.) Moreover, Hollis received positive performance reviews for year-end 2011 and for all of 2012, which cover his time in the sourcing agent position prior to McAlister becoming his supervisor. (Doc. 24-5 at 22, 13.) This evidence suggests that Hollis should have continued to perform well, even under a new team leader.

Nonetheless, Hollis describes the performance of his duties under McAlister as "a new method of handling contracts with which [he] was unfamiliar" and maintains that he received no training on this method until mid-2013. (Doc. 18-2 at 3; Doc. 23 at 29.) Upon discovering, after taking over as Hollis's supervisor in May 2013, that Hollis's work product did not conform to his expectations, McAlister instituted a "performance counseling process" and viewed the corresponding "Action Plan" as additional "training" for the position. (McAlister Dep. at 47:9–49:3.) As part of the performance counseling, McAlister reviewed not only the mock contracts Hollis prepared pursuant to the Action Plan but Hollis's other

contracts as well. (*Id.* at 48:19–49:3.) McAlister also asked a clerical employee to assist Hollis in addressing his formatting issues and converting documents to PDF format. (Hollis Dep. at 160:4–161:1.)

Hollis does not assert that the performance counseling was unwarranted and acknowledges that his contracts did not conform to McAlister's "vision of the . . . supply chain contract" prior to the institution of the performance counseling. (*Id.* at 55:3–55:19.) However, Hollis raises a genuine issue of fact as to whether McAlister's requirements were applied equally to all the employees he supervised. Of the three sourcing agents, Hollis was the only employee McAlister placed on "performance counseling" and was thus "the only contract agent that [McAlister] was critiquing daily." (*Id.* at 240:1–240:14.) On one occasion, McAlister reprimanded Hollis for "the way [he] set [a contract] up," only to realize that Courtney Cheek ("Cheek"), another sourcing agent under McAlister's supervision, had done "the same thing." (*Id.* at 52:2–52:15.) McAlister had also instructed Hollis to look at the work of co-worker David Andrews ("Andrews") as an example of proper documentation. (*Id.* at 42:22–43:7.) Hollis submitted a contract to McAlister based on a template that Andrews had prepared, which had the "specification" highlighted in blue. (*Id.* at 41:6–42:19.) Hollis received disciplinary action because he used colors in a contract document after McAlister

had asked him not to, but Andrews did not receive disciplinary action for the same conduct. (Doc. 23 at 35.) This inconsistency in the application of contract requirements is suggestive of pretext.

As additional evidence that McAlister specifically targeted him for termination, Hollis points to his performance reviews under previous supervisors, who consistently rated him as "Meets Expectations." (*Id.* at 27–28.) Evidence that an employee "with [a] good employment histor[y] beg[ins] receiving poor evaluations" from a new supervisor may indicate a discriminatory motive if "the factual basis for the poor evaluation [is] in dispute." *Rojas v. Florida*, 285 F.3d 1339, 1343 (11th Cir. 2002) (citing *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999)). "Different supervisors may impose different standards of behavior, and a new supervisor may decide to enforce policies that a previous supervisor did not consider important." *Id.* (citing *Jones v. Gerwens*, 874 F.2d 1534, 1542 n.15 (11th Cir. 1989)). However, the supervisor must not "single[] out [the employee] for increased enforcement of departmental regulations." *Id.*

Hollis correctly states that he received disciplinary action related to his performance only after McAlister became his supervisor in May 2013. (Doc. 23 at 15, 28.) It is clear from the record that Hollis struggled with organizing documents and using technology in accordance with SCS's expectations as far back as 2010,

prior to his developmental move to the sourcing agent position. (Doc. 24-5 at 40.) Although Hollis's performance was rated as "Expectations Fully Met" that year (*id.* at 30), his supervisor pointed out that he needed to "quickly improve[] his understanding and use" of the company's software and that his files "appeared unorganized and [it was] hard to locate key documents" (*id.* at 40). Following Hollis's transfer to the sourcing agent position in August 2011, Belman rated him "Expectations Fully Met" (*id.* at 22) but listed SCS's software as one of Hollis's "key gaps" for that part of the year (*id.* at 29). Belman also identified use of technology and organization as "key gaps" for 2012 (*id.* at 20) and stated on her midyear review that Hollis "need[ed] to continue his focus on timeliness of completing documentation" (*id.* at 21). The fact that Hollis met his previous supervisors' expectations—but not McAlister's—despite his struggles with technology, combined with the evidence that McAlister demanded more of Hollis than of his co-workers, is sufficient to create an issue on pretext. Moreover, Hollis asserts that he corrected the problems McAlister identified in his work product (Doc. 23 at 33), and his contracts required fewer edits in the last few months of 2013 (McAlister Decl. ¶¶ 42–46).

In sum, at the time of his termination, Hollis was a sixty-three-year-old employee who had worked for SCS in some capacity for over two decades. His

supervisors had always rated him positively on his performance reviews, commending him for his strong relations with plant personnel and his contracts knowledge. He was promoted regularly and recognized for his commitment to volume procurement for the company, but he sought supervisory experience. Upon the recommendation of Belman and McAlister, Hollis accepted a developmental transfer to prepare labor contracts for Southern Power. He performed well in this position for nearly two years and, after Belman was promoted, interviewed for the team leader position. McAlister also interviewed, was selected, and began shortly after taking over as Hollis's supervisor to express dissatisfaction with Hollis's work. Six months later, despite noted improvement, Hollis was terminated due to "performance issues" and his "lack of attention to detail." His replacements were much younger and had considerably less experience preparing contractual documents. This evidence, when viewed in the aggregate, is sufficient to raise a genuine issue of fact as to whether SCS unlawfully discriminated against Hollis due to his age.

## V.   Conclusion

For the reasons stated above, SCS's Motion for Summary Judgment (Doc. 16) is due to be DENIED.[3] A separate order consistent with this opinion will be entered.

**DONE** and **ORDERED** on September 16, 2016.

L. Scott Coogler
United States District Judge

186289

---

[3] Because this Court declined to consider the disputed evidence that is the subject of the parties' motions to strike (Docs. 25 and 31) in ruling on the instant motion for summary judgment, those motions are due to be terminated as moot.